UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| ONE CHECK IN THE AMOUNT OF | * | |
| $47,000 PAYABLE TO BRIAN DEIORIO, | * | |
| SEIZED ON NOVEMBER 21, 2014, TO | * | Civil Action No. 14-cv-14261-ADB |
| WHICH REPRESENTS CURRENCY | * | |
| PREVIOUSLY SEIZED FROM 39 | * | |
| KEAYNE STREET, REVERE, | * | |
| MASSACHUSETTS ON MAY 24, 2012, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER DENYING MOTION TO DISMISS**

BURROUGHS, D.J.

This case was brought by the United States seeking *in rem* forfeiture of a $47,000 check payable to Brian D'Iorio. The United States alleges that the currency is subject to forfeiture because it is connected to illegal drug and/or gambling activity. Currently pending is claimant Brian D'Iorio's motion to dismiss. [ECF No. 11]. For the reasons stated herein, the motion to dismiss is denied. The Court also finds, however, that D'Iorio has constitutional and statutory standing and that he may intervene as a claimant in this action.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

On May 24, 2012, the Massachusetts State Police seized $47,000 in cash from Brian D'Iorio's Revere, Massachusetts residence, pursuant to a state search warrant for gaming violations. The search of D'Iorio's home was part of a larger investigation into a narcotics and money laundering organization operating in and around Boston, Massachusetts. D'Iorio was not

arrested or charged with a crime at the time of the seizure, or any time thereafter in connection with the investigation.

Thereafter, D'Iorio received a CAFRA Seizure Notice from U.S. Customs and Border Protection. At some point after the initial seizure, the Massachusetts authorities released the funds to the federal government. The CAFRA Seizure Notice indicated that the funds had been seized by the U.S. Department of Homeland Security, Office of Investigations (HSI) and were subject to forfeiture because they were traceable to the exchange of a controlled substance or to smuggling.

In 2012, D'Iorio filed two motions for return of property in Chelsea District Court. In the first, filed on July 18, 2012, D'Iorio argued that there was not probable cause to believe that there would be evidence of illegal gambling at his address and as a result, the seized property should be returned. On August 22, 2012, Judge Maldonado denied this motion. Though D'Iorio had still not been indicted for any crime, Judge Maldonado found that the search warrant had been reviewed and signed off by a magistrate, and that returning the property, only a few months after the search, would not be appropriate.

D'Iorio's second motion for a return of property, filed in Chelsea District Court in October 2012, contested the release of the $47,000 in cash from Massachusetts authorities to the federal government. Relying on Commonwealth v. Rufo, 708 N.E.2d 947, 948–49 (Mass. 1999), D'Iorio argued that property seized pursuant to a state search warrant remains in the custody of the court that issued the warrant and may not be turned over to federal authorities. Justice James H. Wexler of the Chelsea District Court agreed, and in a July 2013 decision, he ordered that the $47,000 be returned to D'Iorio. He found that even though the seized funds had been transferred to federal authorities, they remained under state court jurisdiction. Because he had no basis to

determine what ongoing interest the Commonwealth or the United States had in the funds, he granted the motion and ordered that the funds be returned.

Pursuant to Judge Wexler's order, the Department of Homeland Security, which had custody of the currency, requested a check from the United States Treasury payable to D'Iorio. On November 21, 2014, after considerable delay, the check was hand-delivered to D'Iorio's counsel by a federal agent, but was immediately re-seized by the agent, pursuant to a seizure warrant issued by Magistrate Judge Dein on November 17, 2014. See Case Number 14-mj-5123-JGD.

On December 10, 2014, the United States instituted this *in rem* action for forfeiture of the $47,000 check. It filed a Verified Complaint [ECF No. 2] and an Affidavit of Phillip J. Lavoie, Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations [ECF No. 2-3]. The United States stated that the Defendant Currency was subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it (a) represents money, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846; (b) represents proceeds traceable to such an exchange; and/or (c) represents moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation. In addition, the United States stated that it had probable cause to believe that the Defendant Currency was subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to illegal gambling in violation of 18 U.S.C. § 1955, and pursuant to 18 U.S.C. § 1955(d) as property used in violation of 18 U.S.C. § 1955.

In his affidavit, Lavoie stated that he had probable cause to believe that the check was subject to forfeiture because it was linked to illegal drug or gambling activity. [ECF No. 2-3 ¶¶ 5-6]. The affidavit says notably little about D'Iorio. Instead, the majority of the affidavit is devoted to explaining a state drug and gambling investigation that led to the arrest of 12 people, but not D'Iorio. Id. ¶¶ 19–42.

The affidavit attempts to link D'Iorio to the drug and gambling activity uncovered by the investigation. Id. ¶¶ 43-52. Lavoie states that, based on his participation in the investigation, he knows that D'Iorio supplied the drug trafficking organization with marijuana and enforced the collection of its gambling debts. Id. ¶¶ 43, 45. He specifically describes a series of phone calls that took place a few days before the search, which led him to believe that D'Iorio collected $14,000 in illegal gambling debts. Id. ¶¶ 47-52. The only other specific allegation connecting D'Iorio to the larger investigation is that camera surveillance in April 2012 revealed that D'Iorio visited a residence used by the drug organization to store and distribute narcotics. Id. ¶ 43.

On May 24, 2012, investigators made a forcible entry into D'Iorio's residence. Id. ¶¶ 53–54. During the search, among the items recovered by investigators were the following: (1) marijuana; (2) two money counters; (3) a chest plate for a bullet-proof vest; (4) various prescription medications, anabolic steroids, and other performance enhancing substances; (5) prescriptions and prescription pads; (6) more than twenty cellular phones; (7) two Ziploc bags containing signature stamps; (8) one cellular telephone digital voice recorder; (9) signature stamps in the names of various businesses and individuals; and (10) $47,000 in United States currency. Id. ¶ 55. The $47,000 was found in two blue plastic bags located in a secret compartment behind the molding at the base of the kitchen island. Id. ¶ 56. In the same hidden

compartment, investigators also found passports in the names of D'Iorio and his girlfriend, and credit cards and other documents in D'Iorio's name. Id. ¶ 54, 56.

On February 18, 2015, the Court issued a Warrant and Monition against the Defendant Currency, which instructed the United States to give notice of the forfeiture action to all interested parties. [ECF No. 4]. The United States provided direct notice to D'Iorio and his counsel in mid-March and also provided public notice online from February 28, 2015, and through March 29, 2015 [ECF No. 8]. Pursuant to the Warrant and Monition, and Rule G of the Supplemental Rules for Admiralty and Maritime Claims to the Federal Rules of Civil Procedure, any claims to the Defendant Currency had to be filed with this Court and served upon Assistant U.S. Attorney Doreen Rachal within 35 days of receiving actual notice, and answers to the complaint had to be filed 21 days after the filing of the claim.

On July 21, 2015, D'Iorio filed a motion to dismiss the complaint for failure to state a claim. [ECF No. 11]. On August 5, 2015, the motion was granted as unopposed after the government failed to file an opposition within the 14 days allowed under Local Rule 7.1. [ECF No. 12]. On August 7, 2015, the United States filed an assented-to motion requesting that the Court vacate its order granting the motion to dismiss and give the United States additional time to file its opposition. [ECF No. 14]. The Court granted the motion and directed the United States to file its opposition by August 28, 2015. [ECF No. 15]. The government filed its opposition brief on August 28. [ECF No. 17]. It argued that not only should the motion to dismiss be denied, but that a default judgment should be entered because D'Iorio lacks constitutional and statutory standing. D'Iorio filed a supplemental memorandum of law in support of his motion on March 1, 2016 [ECF No. 19], and the government filed a reply, by leave of the Court, on March 21 [ECF

No. 22].[1] The Court held a hearing on the motion to dismiss on November 29, 2016, at which it allowed D'Iorio an extension of time to December 5 to file a claim. [ECF No. 27]. D'Iorio timely filed a claim on December 1, 2016. [ECF No. 28].

## II.   DISCUSSION

### A.   D'Iorio's Standing to Contest the Forfeiture

Before reviewing the merits of the pending motion to dismiss, the Court first addresses the United States' threshold argument that a default judgment should be entered in its favor because D'Iorio lacks standing and his motion is untimely. According to the United States, D'Iorio should not be permitted to intervene in this action because he lacks constitutional and statutory standing. The Court disagrees that D'Iorio lacks constitutional standing, and as discussed at the hearing, it allowed D'Iorio an extension of time to comply with the statutory standing requirements. The Court is discouraged by the United States' attempt to remove D'Iorio from this litigation and thereby avoid any review of the forfeiture.

First, the United States claims that D'Iorio lacks Article III standing because he has not demonstrated a sufficient interest in the defendant currency. According to the United States, the motion contains no evidence indicating that he has a possessory interest in the defendant currency. Yet the motion to dismiss, not to mention the caption of case, makes clear that the defendant currency is a check payable to D'Iorio from the United States Treasury. This alone is sufficient to suggest that D'Iorio has a possessory interest in seized funds. "At the initial stage of

---

[1] In its reply, the government argued that the Court should not consider the merits of the supplemental memorandum because it was filed without leave of the court and because it presented new arguments that could have been raised in the original motion to dismiss. The Court agrees, and declines to consider the arguments raised in that memorandum. The Court notes, however, that the memorandum is mainly dedicated to advancing the argument that D'Iorio complied in essence with the requirement to file a claim, which is irrelevant now that D'Iorio has timely filed a claim.

intervention, the requirements for a claimant to demonstrate constitutional standing are very forgiving. In general, any colorable claim on the defendant property suffices." United States v. One-Sixth Share of James J. Bulger In All Present And Future Proceeds Of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 41 (1st Cir. 2003). D'Iorio has easily met this standard.

Second, the United States argues that D'Iorio lacks statutory standing because he did not follow the proper procedure for intervening in a civil forfeiture action in rem. As discussed at the motion hearing, the Court agrees that the United States' arguments on this point were technically correct as a matter of law. At the same time, the supplemental rules governing forfeiture actions in rem permit the Court to extend the time for filing a claim for good cause. Fed. R. Civ. P. Supp. R. for Admiralty or Maritime Claims and Asset Forfeiture Actions G(5)(a)(ii) ("Unless the court for good cause sets a different time, the claim must be filed . . ." (establishing deadlines)). Here, the Court determined that good cause for extending the deadline existed. Although D'Iorio was not in technical compliance with the rules, his communications with the United States and his motion to dismiss fulfilled many of the purposes of the requirement to file a claim. Furthermore, the United States itself was delinquent in responding to the motion to dismiss. [ECF No. 15]. To allow the United States to then turn around and similarly prevail based on the other party's missed deadline would be arbitrary and unjust. Therefore, at the hearing, the Court granted D'Iorio an extension to December 5, 2016 to file a claim, and he timely filed his claim on December 1. [ECF No. 28].

**B.    Motion to Dismiss**

In his motion to dismiss, D'Iorio argues that the factual allegations in the complaint are insufficient to support a reasonable belief that there was a substantial connection between the *res*

and the alleged drug and gambling offenses. He emphasizes the lack of concrete facts presented

by the United States and the conclusory nature of the Lavoie affidavit. D'Iorio also argues that

the evidence cited in the affidavit was illegally seized and cannot be used in the instant case. For

the reasons discussed below, the Court concludes that the complaint presents sufficient factual

allegations to survive the motion to dismiss.

### 1.    Standard of Review

To evaluate a Rule 12(b)(6) motion to dismiss in the asset forfeiture context, the Court

must apply a unique, heightened standard defined by the Supplemental Rules of Civil Procedure

pertaining to asset forfeiture. Under those rules, the complaint must "state sufficiently detailed

facts to support a *reasonable belief* that the government will be able to meet its burden of proof

at trial." Fed. R. Civ. P. Supp. R. G(2)(f) (emphasis added). At the same time, the standard

Federal Rules of Civil Procedure also apply to asset forfeiture proceedings, "except to the extent

that they are inconsistent with [the] Supplemental Rules." Id. at R. A(2). This has led to some

confusion concerning what, if any, relevance the pleading standard defined by Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), has to the

forfeiture pleading standard. Most courts appear to have concluded that the Twombly/Iqbal

standard is not directly applicable, but may nonetheless be generally informative. See, e.g.,

United States v. $134,972.34 Seized from FNB Bank, Account No.-£5351, 94 F. Supp. 3d 1224,

1229–30 (N.D. Ala. 2015); United States v. $22,173.00 in U.S. Currency, 716 F. Supp. 2d 245,

249 (S.D.N.Y. 2010); United States v. Real Prop. & Premises, 657 F. Supp. 2d 1060, 1065–66

(D. Minn. 2009).

As D'Iorio discusses in his motion to dismiss, the Civil Asset Forfeiture Reform Act of

2000, Pub. L. No. 106-185, 114 Stat. 202 (CAFRA), modified the forfeiture process and changed

the government's burden of proof. Under CAFRA, "the burden of proof is on the Government to establish, by a *preponderance of the evidence*, that the property is subject to forfeiture." 18 U.S.C. § 983(c) (emphasis added).[2] If the government's theory of forfeiture is that the property was used in, involved in, or facilitated a crime, the government must "establish that there was a *substantial connection* between the property and the offense." Id. (emphasis added). CAFRA does not discuss the pleading standard, but it does specify that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." Id. § 983(a). CAFRA also permits the government to use evidence gathered after the complaint is filed to meet its burden. Id. § 983(c).

As with a standard 12(b) motion, "the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor." United States v. One Gulfstream G-V Jet Aircraft, 941 F. Supp. 2d 1, 14 (D.D.C. 2013) (citing United States v. Seventy-Nine Thousand Three Hundred Twenty-One Dollars, 522 F. Supp. 2d 64, 68 (D.D.C. 2007)). "Likewise, the plaintiff must be afforded every favorable inference that may be drawn from the allegations of fact set forth in the complaint." Id. (citing Seventy-Nine Thousand and United States v. $829,422.42 in U.S. Currency, No. 3:08CV00914 DJS, 2009 WL 1743753, at *5 (D. Conn. June 18, 2009)).

### 2.    Sufficiency of the Evidence

D'Iorio argues that the evidence provided by the government is not sufficient to establish

---

[2] Contrary to any suggestion made by either party in their briefs or at the motion hearing, "[p]robable cause plays no part" in the new, post-CAFRA standard. United States v. $97,667.00 in U.S. Currency, 538 F. Supp. 2d 1246, 1252 (C.D. Cal. 2007); see also United States v. $2,000,000.00 in U.S. Currency, 906 F. Supp. 2d 1260, 1263 (M.D. Fla. 2012) (explaining the post-CAFRA standard). Prior to the passage of CAFRA, the government was required to demonstrate that it had probable cause at the outset of litigation. $97,667.00 in U.S. Currency, 538 F. Supp. 2d at 1252.

a substantial connection between the property and drug and gambling activity. D'Iorio is correct

that the evidence is far from overwhelming, however, given the "reasonable belief" standard of

review, and the fact that CAFRA does not allow the complaint to be dismissed for lack of

evidence at the time the lawsuit is filed, the complaint survives the motion to dismiss. The

evidence connecting the property to drug activity, discussed first, is stronger than the extremely

weak evidence connecting the property to illegal gambling, discussed second.

As mentioned above, although the Lavoie affidavit contains an extensive discussion of a

drug and money laundering organization operating in and around Boston, it presents little

information pertaining specifically to D'Iorio. The affidavit describes surveillance of suspected

participants, but the only drug-related observation concerning D'Iorio was that he visited a

residence used to store and distribute narcotics in April 2012. [ECF No. 2-3 at ¶ 43]. The

affidavit does not indicate that any items or money changed hands during that visit. Id. The only

other evidence connecting the *res* to drug activity are the items that were found in D'Iorio's

residence at the time of the search. In addition to the $47,000 in cash, which was found in plastic

bags in a secret compartment in the kitchen island, investigators recovered marijuana,[3] money

counters, more than twenty cellular phones, various prescription drugs and performance

enhancing drugs, prescriptions and prescription pads, and a handwritten notecard with a list of

numbers that the affiant believed indicated weights of bales of marijuana. Id. ¶¶ 55–56, 58. The

affiant stated that, based on his personal training and experience, "the amount and variety of

prescription drugs recovered . . . coupled with the recovery of prescriptions, prescription pads,

and multiple cellular telephones are indicative of the unlawful distribution of controlled

---

[3] The affidavit does not state the quantity of drugs recovered.

substances (prescription drugs) in violation of 21 U.S.C. § 841." Id. ¶ 57.[4] The affidavit also contains a conclusory assertion that the affiant "know[s]" D'Iorio "supplied the drug trafficking organization" with marijuana. Id. ¶ 43.

Setting aside the extraneous facts about the larger drug investigation, the evidence found in D'Iorio's residence at the time of the seizure is sufficient to support a reasonable belief that the res was connected to illegal narcotics sales and distribution. "Possession of large amounts of cash, either on one's person or in one's home, particularly where . . . the money is found in the proximity of drugs, may be substantial factors, along with other circumstances, in justifying a conclusion that the money has been generated by drug activity." United States v. Real Prop. with any Improvements Thereon Located at 40 Clark Rd., Sandisfield, Mass., 52 F. Supp. 2d 254, 263 (D. Mass. 1999). The fact that the cash was hidden and found in the same location as marijuana, prescription medications, and further indicia of illegal drug activity (including twenty mobile phones, money counters, prescription pads, and a note card with possible marijuana bale weights) is enough evidence to survive the motion to dismiss.

The evidence indicating that the res was connected to illegal gambling activity is not as strong. The affidavit describes a series of intercepted phone calls in May 2012 between individuals allegedly involved in an illegal gambling organization connected to the drug organization. [ECF No. 2-3 at ¶¶ 45, 47–50]. In those calls, D'Iorio arranged to meet with Philip

---

[4] Investigators also found a number of documents related to hotels, commercial shippers, rental car companies, tortilla chip factories, a self-storage facility, realtors and commercial lessors, and other businesses and transactions in the Boston area, Arizona, and California. Id. ¶ 58. The affiant states that, based on his experience and training, he believes D'Iorio was using front companies to ship marijuana from Arizona through California to the Boston area by concealing it in boxes of tortilla chips and other food products. Id. ¶ 59. The affidavit does not explain, however, how the evidence seized could indicate that this theory is true, and the connection is not readily apparent to the Court.

Consolo, a member of the organization believed to enforce gambling debts. Id. ¶¶ 49–50.

Investigators then observed D'Iorio meet Consolo in a parking lot late one night, although the

affidavit again does not allege that any items or money were observed changing hands. Id. ¶ 51.

The next day, investigators intercepted a phone call between Consolo and the leader of the

organization which led them to believe that D'Iorio had collected $14,000 in illegal gambling

debts from Consolo on behalf of the organization. Id. ¶ 52. The affidavit also states that "DeIorio

enforced the collection of gambling debts on behalf of Masella," without indicating what

evidence was used to form this belief. Id. ¶ 45. The *res* was seized from D'Iorio's residence two

days after his meeting with Consolo. Id. ¶¶ 51, 54. No evidence discovered in the search of the

residence indicated that the money was connected to gambling.

Even taking the above facts as true and drawing all inferences in favor of the government,

as the Court is required to do, it is difficult to see how this evidence could demonstrate that the

entire $47,000 seized was connected to illegal gambling activity; the affidavit appears to indicate

that only $14,000 of the *res*, at most, was involved in the gambling offenses. Further, the fact

that nothing in D'Iorio's residence suggested a connection to illegal gambling makes the

government's proposed connection between the *res* and gambling appear even more tenuous. At

the same time, the Court is hesitant to dismiss this allegation in light of the CAFRA provisions

that a complaint may not be dismissed on the basis of inadequate evidence at the time the

complaint is filed, and that the government may continue collecting evidence to support its case

after the filing of the complaint. 18 U.S.C. § 983(a), (c). The government has provided just

enough evidence to support a reasonable belief that D'Iorio was involved in illegal gambling

activity. Furthermore, taking as true the factual allegation that he handled cash on behalf of the

illegal gambling ring, and considering that the *res* was discovered in his residence two days after

12

he met with Consolo, the government has provided enough evidence to support a reasonable

belief that at least some of the *res* was connected to gambling. Out of an abundance of caution,

the Court will deny the motion to dismiss concerning these allegations.[5]

### 3.     Probable Cause to Search

Lastly, D'Iorio argues that the evidence relied on in the affidavit was illegally seized and

ordered returned by a state court judge, and therefore must be excluded from this proceeding.

D'Iorio cites a series of cases for the proposition that evidence derived from an illegal search is

inadmissible in a forfeiture proceeding, but he does not explain what made the search at issue

here illegal, aside from noting that a state court judge ordered that the items be returned. The

order that D'Iorio appears to reference, however, explicitly found that there was probable cause

to search the location for evidence of illegal gaming. Decision of Justice James Wexler, Case No.

1214SW0042, Chelsea District Court, July 17, 2013 [ECF No. 11-11] at 5.[6] The order granted

the petitioner's motion for a return of the property because the court was unable to determine

---

[5] D'Iorio also points out that a violation of 18 U.S.C. § 1955 requires that the illegal gambling business involve five or more persons and be "in substantially continuous operation" for more than 30 days or have a gross revenue of at least $2,000 on any particular day. Although the affidavit does not specifically allege that the gambling ring possessed these attributes, it does state that the investigation into the related drug organization involving many of the same people led to the arrest of twelve individuals and the seizure of more than $560,000. Id. ¶ 19. The affidavit also indicates that the organization was in continuous operation from October 2011 through May 2012. Id. ¶ 19, 22–23, 32, 36, 39. In addition to the fact that D'Iorio allegedly collected $14,000 on a gambling debt, these facts are sufficient to infer that the gambling operation violated 18 U.S.C. § 1955.

[6] Although the decision constitutes a matter outside of the pleadings, which the Court cannot ordinarily consider, see Federal Rule of Civil Procedure 12(d), the Court may take judicial notice of judicial decisions. Lopes v. Riendeau, 177 F. Supp. 3d 634, 665–66 (D. Mass. 2016) (citing Grajales v. Puerto Rico Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012) and Berrios-Romero v. Estado Libre Asociado de Puerto Rico, 641 F.3d 24, 27 (1st Cir. 2011)). Alternatively, if the Court declined to consider Judge Wexler's decision, D'Iorio's bare assertion that the evidence was illegally seized would be unsupported by any factual allegations or argumentation whatsoever, and thus would be rendered entirely implausible.

what on-going interest, if any, the Commonwealth of Massachusetts or the United States had in the property, not due to any illegality in the initial search and seizure.

## III.    CONCLUSION

Accordingly, the Court finds that D'Iorio has standing and may intervene as a claimant in this action. His motion to dismiss [ECF No. 11], however, is <u>DENIED</u>.

**SO ORDERED.**

December 9, 2016                                     /s/ Allison D. Burroughs
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE